## State v. Luoma
### [Cite as 8 AOA 52]

Case No. 10719
Montgomery County, (2nd)
Decided December 7, 1990

*Walter F. Ruf, Assistant Prosecuting Attorney, Appellate Division, 41 N. Perry Street, Suite 315, Dayton, Ohio 45402, Attorney for Plaintiff-Appellee.*

*Bonnie K. Beaman, 333 West First Street, Suite 470, Dayton, Ohio 45402, Attorney for Defendant-Appellant.*

FAIN, J.

Defendant-appellant James T. Luoma appeals from his conviction and sentence for Murder, with a firearm specification. Luoma contends that the prosecutor's frequent remarks to the jury, during closing argument, that it should send him back home if it should find for him on the disputed factual issues, constituted an improper suggestion to the jury that it should ignore the evidence offered by Luoma in support of his insanity defense because an insanity verdict would have the effect of returning Luoma to the community. We conclude that the state-ments made by the prosecutor during closing argument were improper and prejudiced Luoma's right to a fair trial.

Additionally, Luoma contends that the trial court refused to exclude evidence of prior acts of Luoma depicting him as a violence-prone individual. The evidence of prior acts that Luoma now contends should have been excluded pursuant to Evid. R. 404(B) was not objected to upon that ground at trial, therefore, we conclude that the alleged error was not preserved for appellate review.

Luoma claims that a juror's misconduct denied him his right of trial by a fair and impartial jury. He claims that in connection with a hearing on his motion for a new trial based upon the juror misconduct, Luoma's due process rights were violated when the State, which had been permitted to cross-examine Luoma's witnesses, was allowed to submit the evidence of two witnesses by affidavit, not subject to cross-examination by Luoma. We conclude that the trial court made no actual finding of fact as to whether the incident of juror misconduct occurred; therefore, the claimed procedural error is harmless. However, we conclude that the trial court erred when it held that the alleged juror misconduct, assuming arguendo that it occurred, did not affect Luoma's "substantial rights."

Finally, Luoma contends that the trial court erred by allowing the State to present expert testimony without first laying the proper foundation for that testimony. We conclude that the trial court properly allowed the State's expert witness to testify after a sufficient basis for the expert's opinion was established by the State prior to eliciting the expert opinion from the witness.

Because we agree with Luoma that the prosecutor's remarks during closing argument prejudiced his right to a fair trial, the judgment of the trial court will be reversed and this cause will be remanded for a new trial.

I

Luoma was a medic in the Fourth Infantry Division for thirteen months in Vietnam. In 1983, he was diagnosed as having Post Traumatic Stress Disorder (PTSD). On July 31, 1986, Luoma shot and killed his wife, Sherry. The couple had been separated, and Sherry had filed for divorce prior to the shooting.

Luoma was charged with Murder, with a firearm specification. He pled not guilty and not guilty by reason of insanity, and demanded a jury.

At trial, Luoma argued that the shooting was an accident-that he had been cleaning the gun and did not realize it was loaded when he pulled the trigger. Alternatively, Luoma argued that he was insane at the time of the shooting, as a result of PTSD.

During the State's final closing argument, the prosecutor referred repeatedly to the fact that Luoma would be returned to his home if the jury were to return a verdict in his favor.

Luoma was convicted as charged and sentenced accordingly.

Luoma moved for a new trial, alleging misconduct by a juror. The trial court held a hearing on the motion, and Luoma presented the testimony of two witnesses, both of whom were Luoma's sisters, tending to show juror misconduct. The State offered no evidence to rebut the charge of juror misconduct. After the hearing, the State filed affidavits of two jurors rebutting the misconduct charges. Defense counsel was not permitted to cross-examine the two jurors, nor was counsel permitted to respond to the State's affidavits. The trial court overruled Luoma's motion for a new trial.

Luoma appeals from his conviction and sentence as well as from the denial of his new trial motion.

## II

Luoma's First Assignment of Error is as follows:

"MISLEADING STATEMENTS MADE BY A PROSECUTOR WHICH VIOLATE THE PRO-HIBITION THAT THE JURY SHALL NOT CONSIDER PUNISHMENT IN ITS DELIB-ERATION, CONSTITUTE PROSECUTORIAL MISCONDUCT THAT PREJUDICES THE DEFENDANT AND DENIES HIM THE RIGHT TO A FAIR TRIAL."

Luoma contends that improper statements made by the prosecutor during closing argument led the jury to consider the issue of punishment during their deliberation, and, therefore, prejudiced Luoma's right to a fair trial. Luoma maintains that the statements of the prosecutor presented a "misleading scenario" of the consequence of a verdict of not guilty by reason of insanity as necessarily being Luoma's immediate return to his home.

The statements complained of include the following:

"*** if you get confused *** you are going to send this defendant back to Skylark Drive[1] *** and that's where he wants to go" (T. 1446).

And if you get sidetracked and start thinking about all these other things that defense counsel wants you to talk about, and if you do that, you're going to find the defendant not guilty *** and send him back to Skylark "(T.1447).

"*** if you think *** any of the State of Ohio tried to trick you *** find this defendant not guilty because I live here too *** send him back to Skylark" (T. 1447).

"Put him back there [on Skylark]" (T. 1448).

"If you start thinking about [these red herrings], go back there, don't take your coats off and let's send the defendant back to Skylark" (T. 1448).

"If you start thinking about the murder and killings over there in war, you are going to lose sight of why we're here" (T. 1449).

"*** if we're going to start searching down and say, 'yes, but why do people have to kill,' *** well, that's not why we're here. If you want to use any of that, if you want to use that as an excuse to exculpate this defendant, send him back to Skylark ***" (T. 1452).

"*** if you really think that's an accident *** send him back to Skylark ***" (T. 1453).

"*** if you feel this defendant *** since 1978 was insane, then just find him not guilty because it's your decision" (T. 1462).

"Purposely means *** he did it intentionally *** and if you don't think that, find him not guilty and send him home" (T. 1464).

Where prosecutorial misconduct is urged on appeal, the touchstone of analysis "*** is the fairness of the trial, not the culpability of the prosecutor. ***" *State v. Landrum* (1990), 53 Ohio St. 3d 107, 112, quoting *Smith v. Phillips* (1982), 455 U.S. 209, 219. An error-free trial is not guaranteed by the Constitution. *Id* at 112.

A two-part test has been established to determine whether reversible error exists as a result of prosecutorial misconduct in closing arguments. The first prong of the test is whether the remarks were improper; the second ,prong is whether the remarks prejudicially affected substantial rights of the defendant. *State v. Smith* (1984), 14 Ohio St. 3d 13, 14. It is imperative that the prosecution avoid "insinuations and assertions which are calculated to mislead the jury." *Id* at 14.

Wide latitude is normally given to the parties during closing argument. *Id* at 12. Even though a prosecutor must prosecute with "earnestness and vigor, striking hard blows, [he] may not strike foul ones." *Id.* at 14, citing *Berger v. United States* (1935), 295 U.S. 78, 88.

A jury is not to consider the punishment that will follow as a consequence of its verdict. R.C. 2945.11 provides as follows:

"In charging the jury, the court must state to it all matters of law necessary for the information of the jury in giving its verdict. The court must also inform the jury that the jury is the exclusive judge of all questions of fact. The court must state to the jury that in determining the question of guilty, *it must not consider the punishment but that punishment rests with the judge* except in cases of murder in the first degree or burglary of an inhabited dwelling." (Emphasis added.)

In the case before us, the prosecutor referred not to the punitive consequences that would attend a verdict of guilty, but to the lack of punitive consequences that would result from a verdict in Luoma's favor--either an outright acquittal or a verdict of not guilty by reason of insanity. The underlying principle is the same, however. In reaching its verdict, a jury should consider only whether the defendant's guilt has been satisfactorily established in accordance with the law and the facts; it should not consider the consequences of its verdict, either in terms of the punishment that will be visited upon the defendant if he is convicted, or in terms of the risk he may pose to society if he is not.

In this case, the prosecutor repeatedly made statements regarding sending Luoma home; e.g., "send the defendant back to Skylark," "if you want to use that as an excuse to exculpate this defendant, send him back to Skylark," and "find him not guilty and send him home." This improperly suggested to the jury that it should consider that Luoma would remain at large within the community if it should find him not guilty by reason of insanity. Therefore, the first prong of the two-part test set forth in *State v. Smith, supra,* is satisfied.

It is important to review the closing remarks as a whole, rather than just focusing upon the improper remarks out of context. These remarks, although not specifically referring to the defense of not guilty by reason of insanity, were made immediately following the second of Luoma's closing arguments, which had focused on the insanity defense.[2] From this context, it is likely that the jury would infer that a verdict of not guilty by reason of insanity would necessarily result in Luoma's immediate release.

The State contends that the prosecutor's remarks were merely a response to Luoma 's closing argument, in which he accused the State

of building its case upon distortions, and constituted a warning to the jury not to become confused and entangled in Luoma's version of the facts. However, the remarks regarding Luoma's release went beyond a mere response to the defense closing. In essence, the remarks were a warning to the jury that unless it should find Luoma guilty he would go home immediately. It was an attempt by the prosecutor to appeal to improper sentiment of the jury, regardless of the merits of the case. The remarks were not based upon the evidence introduced at trial. Instead, they were a temptation to the jury to disregard the evidence.

The State contends that the improper remarks do not constitute reversible error because they were not prejudicial. The State relies on the fact that the jury received preliminary instructions regarding its role in conjunction with punishment. In addition, the jury received further instructions during *voir dire,* in the trial court's closing jury instructions (T. 1481), and in the form of a curative instruction (T. 1489) to disregard the consideration of punishment. However, with cases involving flagrant prosecutorial misconduct, "the general instruction that arguments of counsel are not to be considered as evidence [is] insufficient to correct the error." *Smith* at 15, citing *Beyer v. United States. supra,* at 88. A more specific instruction from the court is required.

At the beginning of the prosecutor's closing, the trial court, after objection from defense counsel, instructed the prosecutor to "proceed, within the limits of the law" (T. 1446), but the trial court neither sustained the objection nor instructed the jury to disregard the remark. The trial court did instruct the jury to disregard the last of the prosecutor's remarks complained of: "Find him not guilty and send him home."

In a further final instruction, the trial court reemphasized the importance to the jury of the necessity to disregard the issue of punishment in its deliberations. The instruction given is as follows:

"Also with regard to the disposition of the defendant, that is· a matter for the Court to determine after your verdicts are returned; so that's not for you to be concerned about" (T. 1489).

However, the trial court refused to send this statement in written form with the jury during their deliberations for fear of placing undue emphasis on the particular instruction.

Although an instruction was given in addition to the general instruction from the trial court, the jury continually heard throughout the closing improper comments by the prosecutor. The trial court did not immediately intervene, nor did it immediately give a curative instruction to the jury. Luoma contends that the general instruction given by the trial court only compounded the prejudice created by the prosecutor's statements. The trial court stated, "*** [i]n the event that you find the defendant guilty, the duty to determine punishment is mine" (T. 1481). It is possible that the jury could infer that punishment or incarceration would only follow a verdict of guilty.

Luoma, submitted a proposed instruction, in writing, that would have instructed the jury, generally, concerning the consequences of a not guilty by reason of insanity verdict, but the trial court refused to give Luoma's proposed instruction. Normally, the instruction requested by Luoma would not be proper. However, we agree with Luoma that in the circumstances of this case, in which the prosecutor had repeatedly admonished the jury to send Luoma home if they bought his defense, some instruction would have been helpful to dispel the misimpression that had been created that an insanity verdict would necessarily have resulted in Luoma's immediate return to the community. Unfortunately, Luoma's proposed instruction was a ten-page dissertation on the consequences of an insanity verdict, and the trial judge was within his discretion to reject it as unduly cumbersome and confusing.

"[Where prosecutorial misconduct is of such a prejudicial nature] *** that the prejudice resulting therefrom cannot be eliminated or cured by prompt withdrawal, and admonition and instructions from the court of the jury to disregard it, a new trial should be granted, or the judgment reversed, notwithstanding cautions, admonitions, and instructions by the trial judge." *State v. Maurer* (1984), 15 Ohio St. 3d 239, citing *Books v. Erskine & Sons, Inc.* (1951), 154 Ohio St. 391, 401. Therefore, because we conclude that the corrective measures taken by the trial court were insufficient to repair the damage done by the prosecutor, we find that Luoma's right to a fair trial was prejudiced.

Luoma only objected to the first and last of the prosecutor's statements of which he now complains. "Improper remarks of counsel during argument, unless so flagrantly improper as to prevent a fair trial, should be at once objected to and exception taken; otherwise error cannot be predicated upon the remarks alleged to have been improper." *State v. Wade* (1978), 53 Ohio St. 2d 182, 186, quoting *State v. DeNicola* (1955), 163 Ohio St. 140 (third paragraph of syllabus); *Scott v. State* (1923), 107 Ohio St. 475 (second paragraph of the syllabus).

The colloquy ensuing after Luoma's initial objection to the prosecutor's comments during closing argument is worth quoting in full:

"MR. HECK [for the State]. ***. It's also important to remember why we're here; and if we lose sight of why we're here and if you lose sight of why we're here, then the only one person who is going to benefit is the defendant. You know, it brings back memories of law school when an old professor said, 'If you don't have the law, argue facts. If you don't have the facts, argue the law; and if nothing else, confuse them.' Because if you get confused, if you forget why we're here, you are going to send this defendant back to Skylark Drive

"MR. HOFFMAN. Objection. Objection, Your Honor. The --

. "MR. HECK. -- and that's where he wants to go.

"MR. HOFFMAN. Objection. That's misleading.

"MR. HECK. No, it's not.

"THE COURT. Wait a minute.

"MR. HOFFMAN. I'd like the Court to instruct --

"THE COURT. I'll instruct the jury at the appropriate time. Mr. Heck, please proceed within the limits of the law."

From the foregoing, it appears that Luoma's attorney was still in the process of formulating his reason for objecting to the prosecutor's remarks, and the relief to be requested from the trial court, when he was cut off by the trial court, and the prosecutor was told to proceed. Therefore, the fact that Luoma's attorney was not very specific in stating his objection cannot fairly be held against Luoma; it appears that he had not finished formulating his thinking.

It is true that Luoma failed to object to all but the first and last of the prosecutorial comments of which Luoma now complains. It is not practical to object to each repetition of an offensive remark during closing argument when the first objection has been overruled; each overruled objection serves only to signal the jury that a particularly telling point has been made (hence the objection), which the trial court has deemed perfectly proper.

It is more troublesome that Luoma's attorney did not interpose a continuing objection to any repetitions of the prosecutor's improper, comments when the prosecutor again told the jury it could send Luoma back to Skylark if it were to buy his defense. The issue is very close. It is hard to fault the trial court for failing to react to the repetitions of the prosecutor's improper comments, since no further objections were made; on the other hand, it is not, as though Luoma's attorney made no effort to stop the improper references.

In resolving this close question, we are influenced by our view that the unfairness resulting from the prosecutor's comments was both subtle and pervasive. With 20/20 hindsight, we can see that Luoma's attorney could have done a better job of protecting the record by insisting that his objection be treated as a continuing objection to this line of argument. Nevertheless, Luoma's attorney did object the first time, and appears to have been trying to formulate both the reason for his objection, which was subtle, and the nature of the relief necessary to cure the prejudice, when he was cut off by the trial court abruptly in mid-sentence.

Closing argument is a phase of the trial in which opposing counsel are trained to treat one another with particular deference. It is the tradition in this legal community to avoid interrupting opposing counsel's closing argument if at all possible, and Louis Hoffman is known by this court to be one of the finest adherents of the traditions of the Dayton trial bar.

The situation, then, was one in which we have difficulty faulting either the trial judge or Luoma's trial attorney. And yet, it was fundamentally unfair to Luoma for the prosecutor to have repeatedly suggested to the jury, by implication, that it Should ignore both the evidence and the law concerning Luoma's insanity defense, because to return a verdict of insanity would have the effect of immediately returning Luoma to the community.

The ultimate issue is not whether the trial judge did anything sufficiently wrong to incur the inconvenience of a reversal and remand for a new trial, but whether Luoma got a fair trial. In our view, the prosecutor's comments during closing argument deprived Luoma of a fair trial, and the failure of Luoma's attorney to have requested a continuing objection to those comments, after his first objection was interrupted in mid-thought, did not, under all the attendant circumstances, amount to a waiver.

Luoma's First Assignment of Error is sustained.

### III

Luoma's Second Assignment of Error is as follows:

"THE TRIAL COURT COMMITTED ERROR PREJUDICIAL TO THE DEFENDANT-APPELLANT WHEN, OVER DEFENSE COUNSEL'S OBJECTIONS, IT ADMITTED INTO EVIDENCE PRIOR ACTS OF DEFENDANT DEPICTING HIM AS A VIOLENCE-PRONE PERSON WHICH ACTS WERE IRRELEVANT AND IMMATERIAL TO THE ISSUES AT HAND."

Pursuant to Ohio Evidence Rule 103(A):

"Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and

· "(1) Objection. In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record stating the specific ground of objection, if the specific ground was not apparent from the context."

Proper objection necessary to preserve the right of appellate review is not present in this case. Unless plain error exists, reversible error must be made apparent to the trial judge so that there is opportunity for the judge to correct the error.

Luoma contends that the testimony of William Kindred, who was dating Luoma's wife, Sherry, was improperly admitted into evidence. Kindred testified in reference to a phone call allegedly placed by Luoma to Kindred's grandparents.

"I told them that he was not a police officer at the time when he called them and said that I ran him off the road (T. 310)...I said that they were separated and that they didn't have to worry about him doing anything to them because he was not a police officer (T. 311)."

The first sentence of the alleged improper testimony of Kindred was not specifically objected to by defense counsel. Furthermore, the reason for the objection is not apparent from the context of the testimony. In response to defense counsel's objection, the trial judge stated: "I think he can say what he said. He can't say anything else as to what his grandparents said" (T. 311). The trial judge evidently characterized the objection as a hearsay objection, and Luoma did nothing to challenge that characterization. Under the circumstances, Luoma failed to specify an objection based on the "prior acts" concept. In regards to the second sentence of Kindred's testimony, no

objection was made whatsoever to this testimony. Therefore, the alleged errors were not preserved for appellate review.

Luoma contends that testimony from Luoma's ex-wife, Paulette Blevins, regarding a conversation that took place over lunch the day preceding the murder of Sherry was improperly admitted. This testimony was as follows:

"Q. Once again, if you'll tell us what your husband told you, or your ex-husband told you with regard to hurting people.

"A. He made reference to the fact that he knew people that he could have, you know, hurt someone (T. 1034)."

In addition, Luoma claims that testimony of Robert Reed who was a police officer with Luoma for the Greenville Police Department from 1979 to 1983, referring to how Luoma made an arrest and obtained confessions was improperly admitted by the trial court. This testimony was as follows:

"In a normal investigation, there was ways that you do things or accepted practices. One of the ways, Jim was to bring a defendant in or a suspect in to question the defendant and a common question of a suspect is, 'Are you going to arrest me? Am I going to be arrested for this,' and Jim would say, 'No.' He'd get a confession and the next day he would arrest him." (T. 896-897.)

The stated basis for Luoma's objection to Blevins' and Reed's testimony quoted above was that this testimony exceeded the scope of proper rebuttal. In both instances, the trial court ruled upon each objection on the basis stated by defense counsel. No "prior acts" basis was stated for the objections. As to Blevin's testimony, defense counsel stated, "I would like a continuing objection through to this as not being rebuttal, if I may, to this area" (T 1033). In regards to Reed's testimony, defense counsel stated in response to the trial court asking the basis for objection, "It's not rebuttal, Your Honor" (T. 986). In both instances, no objection was made based upon a "prior acts" analysis. Accordingly, Luoma cannot now raise that issue on appeal.

Luoma's Second Assignment of Error is overruled.

## IV

Luoma's Third Assignment of Error is as follows:

"A. EVIDENCE THAT A JUROR HAS DEFI-ANTLY EXPRESSED AN OPINION AS TO THE GUILT OF THE DEFENDANT DURING THE COURSE OF THE TRIAL, WITNESSED A VERBAL AND PHYSICAL CONFRONTATION BETWEEN A THIRD PARTY AND ONE OF THE DEFENDANT'S WITNESSES CONCERNING THE CRUCIAL ISSUE OF DEFENDANT'S INSANITY AND RELAYED THE FOREGOING TO ANOTHER JUROR, CONSTITUTES JURY MISCON-DUCT DEPRIVING DEFENDANT-APPELLANT OF HIS RIGHT TO AN IMPARTIAL JURY.

"B. THE TRIAL COURT COMMITTED ER-ROR PREJUDICIAL TO THE DEFENDANT-APPELLANT WHEN IT OVERRULED DEFENDANT'S NEW TRIAL MOTION BY ARBITRARILY: 1) DENYING DEFENDANT HIS RIGHT TO CROSS-EXAMINE AND CONFRONT THE STATE'S WITNESSES ON THE ISSUE OF JURY MISCONDUCT, AND 2) IGNORING DUE PROCESS SAFE-GUARDS SET OUT IN THE RULES OF CRIMINAL PROCEDURE.

Luoma moved for a new trial, alleging a juror's misconduct violated his right to a fair trial by an impartial jury.

During the hearing on his motion, Luoma's sister, Marty Hendon, testified that during the trial, before Luoma had finished presenting his evidence, a juror said to a non-juror that "Luoma is a menace to society and should be locked up and the key thrown away forever." A confronta-tion between the sister and the juror followed. This testimony was partially corroborated by Sandra Randall, Luoma's other sister, although she did not overhear the quoted remark.

The State of Ohio cross-examined the wit-nesses for the defense. The State did not present any evidence or witnesses during the hearing. Later, the State filed a memorandum contra defendant's motion for a new trial and attached affidavits from two jurors, in which both denied that the juror (who was one of them) made the remark. The State offered these affidavits pursu-ant to Crim. R. 33(C), which provides as follows:

"The causes enumerated in subsection (A) (2) and (3) must be sustained by affidavit showing their truth, and may be controverted by affida-vit."

The trial court refused to allow defense counsel the opportunity to respond to the State's filing. Luoma's motion for new trial was denied. Luoma contends that the juror's misconduct deprived him of his right to an impartial jury, and that he was denied the opportunity to con-

front and to cross-examine the State's witnesses, and, therefore, was denied due process during the hearing.

"It is a long-standing rule of this court that we will not reverse a judgment because of the misconduct of a juror unless prejudice to the complaining party is shown." *State v. Hipkins* (1982), 69 Ohio St. 2d 80, 83, quoting *Armleder v. Lieberman* (1877), 33 Ohio St. 77; *State v. Kehn* (1977), 50 Ohio St. 2d 11, 19.

The trial court, in its decision denying Luoma's motion for a new trial, noted that it had some "doubts" as to whether the incident concerning which Luoma's sister testified actually occurred, which is understandable in view of her relationship to Luoma and the fact that she did not report the incident to Luoma or his attorneys until long afterwards. However, the trial court made no factual finding as to whether it did occur as alleged, but simply assumed for purposes of argument that the incident between Luoma's sister and a juror actually occurred. Therefore, for present purposes, we must likewise assume that it did occur as alleged.

We conclude that the trial court erred when it held that the juror's misconduct, assuming that it occurred, was not sufficiently prejudicial to Luoma.

The right to a trial by a jury is not a mere matter of empanelling a jury. The right to have one's guilt or innocence determined by an *impartial* jury of ones peers is central to this important right, enshrined in both the Sixth Amendment to the United States Constitution:

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an *impartial* jury ***." (emphasis added), and in Section 5, Article I of the Ohio Constitution:

"The right of trial by jury shall be inviolate, ***."

Toward the end of securing Luoma a trial by an impartial jury, the trial court properly instructed the jurors, just after they were selected, that they should not discuss the case, even among themselves, before its submission to them, and that they should not form or express any opinion on the case until its submission to them. These admonitions were repeated throughout the course of the trial as recesses and adjournments were taken.

If the incident occurred as Luoma has alleged, at least one of the jurors to whom this case was submitted patently and flagrantly violated her obligation not to form or to express an opinion before submission of the case to her. The remark displayed an antipathy to Luoma that was completely antithetical to any notion that this juror, at least, was keeping an open mind until all of the evidence was in, the arguments were heard, and the instructions of law were given.

If the incident did, indeed, occur as alleged, it would not only establish that Luoma was deprived of his right to a trial by an impartial jury, it would be shocking to the conscience of the court.

Luoma's Third Assignment of Error is sustained to the extent that we hold that the trial court erred when it held that the juror misconduct alleged by Luoma, assuming that it occurred, was not sufficiently prejudicial.

V

Luoma's Fourth Assignment of Error is as follows:

"A. THE TRIAL COURT COMMITTED ER-ROR PREJUDICIAL TO THE DEFEN-DANT-APPELLANT WHEN, OVER OBJEC-TION, IT ARBITRARILY REFUSED A VOIR DIRE EXAMINATION OF AN EX-PERT, AND PERMITS THE EXPERT TO GIVE OPINION TESTIMONY ON THE ISSUE OF INSANITY AT THE TIME OF THE CRIME WHEN SAID WITNESS CON-CEDES THAT HIS SOLE PURPOSE FOR EVALUATING THE DEFENDANT WAS TO DETERMINE DEFENDANT'S COMPETENCY TO STAND TRIAL.

"B. THE TRIAL COURT COMMITTED ER-ROR PREJUDICIAL TO THE DEFEN-DANT-APPELLANT WHEN IT PERMIT-TED OPINION TESTIMONY TO BE GIV-EN ON THE ISSUE OF POST TRAUMAT-IC STRESS DISORDER, WHEN THE WIT-NESSES GIVING SUCH TESTIMONY CONCEDED THAT THEY WERE NOT EXPERTS ON THAT SUBJECT."

The trial court permitted Dr. Samy, a psychiatrist, to testify concerning Luoma's sanity at the time of the crime after having examined Luoma for purposes of determining competency. Dr. Samy and Dr. Keuhnl, a psychologist, both testified regarding Luoma's PTSD, even though they were not experts in this particular disorder.

An appellate court "will not reverse a ruling of a trial court on the qualification or competency of an expert witness to give his

opinion upon a particular subject unless there is a clear showing that the trial court abused its discretion." *State v. Decker* (1986), 28 Ohio St. 3d 137, 138, quoting *State v. Jones* (1981), 67 Ohio St. 2d 244, 251; *State v. Hipkins* (1982), 69 Ohio St. 2d 80, 82.

Luoma claims that because Samy examined him for the sole purpose of evaluating his competency to stand trial, Samy is not competent to testify regarding the issue of insanity at the time of the crime. *State v. Henley* (1968), 15 Ohio St. 2d 86 (first paragraph of syllabus) held:

"Where an accused interposes insanity as a defense for a criminal act, the expert opinion of a physician relative to the mental condition of the accused at the time of the crime is competent, although the observations upon which that opinion is based were obtained in part during the course of an examination called for by the court for an entirely different purpose."

In *Henley,* the doctor not only attempted to determine Henley's competency to stand trial during his examination, but he also performed additional tests to determine his past mental condition. The doctor testified that the tests supplied him with a sufficient basis for him to make a conclusion as to Henley's past mental condition. *Id,* at 89.

Ohio Evidence Rules 703 and 705 provide, respectively:

"The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by him or admitted in evidence at the hearing.

"The expert may testify in terms of opinion or inference and give his reasons therefor after disclosure of the underlying facts or data. The disclosure may be in response to a hypothetical question or otherwise."

In the case before us, Dr. Samy testified that he saw Luoma for approximately one half hour the day after Luoma had been admitted to the Dayton Mental Health Center Forensic Center. Dr. Samy examined Luoma three or four times and spoke to Luoma on several other occasions during the first weeks of his stay at the Forensic Center.

Dr. Samy testified as to the procedure he follows when first examining a defendant. The procedure includes observation and interpretation of the defendant's answers, his attitude, mood and response to questions. The defendant's thought process and thought content is analyzed with observations focused on his memory, judgment and insight.

· He further testified that this procedure is the same procedure he used when he previously testified in other courts as to the sanity of other defendants at the time of the crime. Dr. Samy testified that, "*** mainly I rely in [sic] the police report *** because this is the most honest description of his condition at that point" (T. 1157).

We conclude that there was a sufficient foundation established for Dr. Samy to render an opinion regarding Luoma's sanity at the time of the offense, and Luoma's criticism of the procedure used to formulate this opinion goes to the proper weight to be given to the testimony elicited from Dr. Samy, not to Dr. Samy's competency to render an opinion. As stated to the jury in the general instructions by the trial court:

"As with other witnesses, upon you alone rests the duty of deciding what weight to give to the testimony of the experts. In determining its weight, you may take into consideration their skills, experience, knowledge, veracity, familiarity with the facts of this case, and the usual rules for testing credibility and determining the weight to be given to the testimony (T. 1471)."

Furthermore, a proper foundation was presented to the trial court and the trial court correctly accepted Dr. Samy and Dr. Kuehnl as experts in psychology pursuant to Ohio Evidence Rule 702, which provides:

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

Dr. Kuehnl testified concerning her educational background, which included a master's degree in counseling psychology, a Ph.D, and a license by the State of Ohio to practice psychology. She testified regarding her affiliation with professional organizations and professional appointments. In addition, Dr. Kuehnl teaches at several institutions of higher education. She testified to her actual practice with PTSD and continuing education courses in the area of anxiety and stress disorders. In addition, Dr. Kuehnl has testified on numerous previous occasions and completed several competency-sanity evaluations.

Dr. Samy is employed by the Dayton Mental Health Center, Forensic Division as a forensic psychiatrist. Dr. Samy is a medical school graduate and has served as a staff psychiatrist for the Department of Mental Health for the State of Ohio. In addition, Dr. Samy has testified previously in the Montgomery County Common Pleas Court and has read treatises regarding PTSD. We conclude that Drs. Kuehnl and Samy both satisfied the standard provided by Ohio Evidence Rule 702 for expert testimony.

Furthermore, both doctors' testimony was subject to cross-examination by defense counsel. Any lack of knowledge in the area of PTSD was pointed out during cross-examination, and was presumably considered by the jury in determining what weight to give the.particular expert's testimony.

Luoma's Fourth Assignment of Error is overruled.

### VI

Luoma's First Assignment of Error having been sustained, his conviction and sentence will be reversed, and this cause will be remanded for a new trial.

BROGAN, J., concurs.

WOLFF, P.J., dissents.

WOLFF, P.J., dissenting.

I respectfully dissent from the majority's disposition of the first assignment of error, and from the judgment.

The prosecutor's remarks, quoted in the majority opinion, were made during the rebuttal portion of the state's closing argument, which takes up twenty-one pages of the written record.

The offending remarks were "send (Luoma) back to Skylark", "send him home", and other similar expressions.

I cannot agree with the majority that these remarks were a calculated invitation to the jury to ignore the evidence and to consider the societal risks attendant upon a not guilty verdict.

I view these remarks as, at most, improper rhetorical flourish added to otherwise legitimate rebuttal argument, the gist of which was, to paraphrase, "if you think the State tried to trick you, or if you buy into this accident or insanity business, find Luoma not guilty; *send him home.*" I agree with the majority that

"send him home", and similar expressions, were improper because they could have suggested that a finding of not guilty by reason of insanity would result in Luoma's immediate release, which was only one possible eventuality if the jury so found. (It was the only eventuality if the jury found that the shooting was an accident.)

Rather than finding the prosecutor's offending remarks to be an invitation to ignore the evidence because Luoma was a menace to society, I find them to be disparagement of defense counsel's argument that the state's case was built on distortions, and disparagement of the accident and insanity defenses.

Because the remarks did intrude upon the subject of consequences, they were improper. In the absence, however, of any invitation to ignore the evidence in the interests of public safety or the like, I fail to see any significant possibility of prejudice to Luoma. Certainly the jury must be given credit, even in the absence of any instruction, for appreciating that the consequences attendant upon a finding of not guilty by reason of insanity were different than those attendant upon a finding of guilty, even though the consequences did not necessarily include immediate release. The jury would not have needed the possibly misleading remarks of the prosecutor if, ink fact, it would have been of a mind to ignore the evidence because of public safety concerns.

It must also be remembered that, in addition to not guilty by reason of insanity, Luoma interposed the defense of accident, which, if found by the jury, would have resulted in a finding of not guilty. The jury should be given credit for appreciating the consequences of finding Luoma not guilty on that basis, particularly where it had been instructed that punishment is the province of the court where there is a finding of guilty.

Assuming *arguendo* that the prosecutor's remarks were Prejudicial, they would not, in my estimation, rise to the level of plain error. See *State v. Underwood* (1983), 3 Ohio St. 3d 12. As such, error can only be predicated upon the prosecutor's remarks if they were objected to during the trial in a manner sufficient to preserve the error for appellate review. In my judgment, they were not.

Although the majority recognizes the desirability of at least a continuing objection to a repetitious line of argument, the majority does not insist upon it as the price of preservation.

I disagree. I fully appreciate the practical difficulties of objecting during final argument to every offending remark in a repetitious line of argument, and I would not insist that counsel do so or be held to have waived his objection. I would insist, however, that where an offending repetitious line of argument is undertaken, a continuing objection be interposed to preserve the alleged error for appellate review.

Where, as here, an objection to an offending remark is overruled, the trial judge must be alerted to the fact that counsel does not agree with his initial ruling when the offending remark is next repeated in the argument. If counsel does not want to object repeatedly, he must utilize a continuing objection. Otherwise, the trial judge has no way of knowing with certainty that counsel continues to contend that the line of argument is improper, and, accordingly, the trial judge should not later be held to have erred in permitting the line of argument.

For these reasons, I would overrule the first assignment of error.

---

[1] "Skylark" is the name of the street upon which the defendant was living prior to being charged with the crime.

[2] Luoma's trial attorneys split his closing argument. Dennis Lieberman essentially argued the accidental shooting theory. Louis Hoffman argued the insanity defense.